I think that it is possible that if that is what causes it to pass Step 2, I also think that that is what causes it to pass Step 1 as well, so that if it is, it would pass both Steps. That is correct in our view. That is right, Your Honor. In our view, the increase in Step 1 is relevant to Step 2. Okay, the next argued case is number 171694, Momenta Pharmaceuticals, Inc. v. Bristol-Myers Squibb Company. Ms. Maynard. May it please the Court, Deanne Maynard for Momenta Pharmaceuticals. The patent at issue here claims nothing more than the textbook recipe. Can we talk about appealability first? Yes, sir. Which is sort of a predicate question. It is, Your Honor. Tell me if I am mistaken about this because the record is not entirely clear. Do you agree that the product that your client has in clinical trials would infringe the claims of the 239 patent? Yes, Your Honor. Okay, and as I understand it, your client has said there is a substantial risk that they would have to abandon the pursuit of that product if the Board's decision here stood, right? Right, we would have to change the formulation. Can you explain how we are supposed to understand the May 2, 2017 earnings call? I'm not sure who this is. Is this the representative from the company who said, based on the Court's decision, this is a quote at A3845, and when it says Court's decision, it was referring to the Patent Board. Based on the Patent Board's decision, we have adjusted our strategy to allow us to proceed independent of the outcome. One, I think, fair reading of that statement is from Momenta's point of view, it doesn't matter whether this patent here is valid or not because they are going to be able to proceed independent of the validity of this patent. Am I misreading that? Yes, Your Honor. Okay. As the declaration from Mr. Wheeler explains, what that means is if the Patent Office's refusal to cancel the patent stands, Momenta will be forced to spend more money changing its plans and lose some costs that it's already spent, which it's already spent millions of dollars developing the current formulation. And now it's faced with the Patent Office's erroneous refusal to cancel this patent, and it's at a fork in the road as a result of that agency decision. And that's the decision that harms us, and it harms Momenta now, today. And so the fact, in fact, Judge Chen, I would suggest that the fact that Momenta is forced to adjust its business strategy as a result of this erroneous board decision is itself proof of immediate harm, concrete harm to Momenta that it will suffer today if it's not able to bring this challenge and get this decision reversed. And that would be true regardless of whether, when it files its application and ultimately gets approved. The harm is from the agency's refusal to cancel the patent and Momenta being forced now. Well, I guess what I'm also wondering is about the November 1 press release indicating that something went wrong with the Phase 1 trial. And maybe it's the problematic Phase 1 trial that, if anything, might cause Momenta to somehow pivot with its development of a formulation. And so could you describe how are we supposed to understand the content of that press release? It was a little technical about endpoints and pharmacokinetics, and I don't really understand what that means. But can you nevertheless try to explain to me where is Momenta now? All I could tell was it was bad news. So where are they in the face of that bad news? It has nothing to do with the patent. It has everything to do with the formulation development. But the point you just made, Your Honor, is the key one for present purposes. It has nothing to do with this patent. And Momenta, the PKs, so to my understanding of what it means to fail to meet the endpoints of the PK study, is that when it was doing a comparison of its product to the Arencia product, the PKs were not identical. But that has nothing to do with this patent. Let me ask you a question. Suppose, hypothetically, and I know that this isn't necessarily the case here, suppose that you started clinical trials. It was a failure. The company announced that it was abandoning this effort because it just didn't work. I mean, that would deprive you of standing, wouldn't it? I think, respectfully, that would make the case moot. We had standing when we noted our appeal. Okay, well, it would make it moot. There wouldn't be anything more to complain about. Even though you might choose in the future some other formulation which also might infringe. Well, I think everything depends on its facts, Judge Dike, its fact-specific inquiry. If there were, I mean, we're speaking hypothetically now because Momenta has not abandoned the program. Okay, let me raise another question. Is it clear that you're not arguing or disputing that you could not bring a declaratory judgment action in the district court under Article III, that there would not be Article III standing in the district court? Is that something that you are disputing? I would dispute that, Judge Newman, but I think that would be a different, you would be asking different questions. Let's answer the question. Your position is that you would be in a position to bring a declaratory judgment action, that is, that there would be Article III standing in the district court. I think it would be a different question, so I'm not conceding it because this court's decision. But Article III, the precedent that we are trying to figure out and to apply raised the question of Article III, and so it's something that I think you should not ignore, and I'm not sure that we can ignore it. That's why I ask for your position. Thank you, and I want to explain the difference. So I think that would be a harder case because we would have to meet the immediacy and rightness concerns that concern this court in Amgen. I would think it would be a very easy case. Precedent is against you strongly. Is it not? The difference would be between this and Sanders v. Amgen would be if this court made the point in Sanders v. Amgen that Sanders there had put forth no proof that it needed a decision now, that it was suffering harm in the absence of a judicial ruling at that point in time if it didn't get a ruling on the merits of the patent, and that's the distinguishing factor here. We have put in ample evidence that we are harmed right now by this decision by the Patent Office. So I think it would be a harder question, Judge Newman. It's a different question, though, than the one that you're presenting. My understanding is the opinion did recognize that Sanders had put in a lot of time, and it was very costly to get all the way up to Phase III, which, whatever that is, it sounds like it's further along than Phase I. But the focus of the opinion was there just wasn't enough of an immediacy or reality to suggest that at that point in time, at Phase III, Sanders had something that could be called a concrete harm that translates to a justiciable case or controversy. And so that's why Sanders didn't get its D.J. action to go forward. So to be clear, it was that case turned on rightness concerns. This court was concerned it wasn't sufficiently right. I don't want to fight that case because I'm not here trying to win that case. We haven't brought a D.J. action. We're challenging wrongful agency action. I think that's crucial. But the point I'm making is based on Sanders v. Amgen at pages 1281 to 1282 where the court says, at the same time, Sanders has not shown that it will suffer an immediate and substantial adverse impact from not being able to seek or secure a patent adjudication before filing an application for FDA approval. And in contrast, we have shown that here. We have facts in the record, a declaration from the CEO backed up by public filings subject to SEC laws that we've spent lots and lots of money developing. The point you're making is because your moment is years further behind in the development process than Sandoz. It has a more significant harm that it is currently suffering than what Sandoz was suffering, even though Sandoz was at phase three and not phase one? Sandoz, the point I'm making is what the court's decision says, is that Sandoz did not put forth a record that it was going to make a business decision, as we are here, based on whether or not the patent stands after the agency action that we're challenging. The standout still was that they didn't provide any evidence as to how the product mapped onto the patent claims. That too, Your Honor. And they didn't say that they were going to be affected by the decision one way or the other in their planning. And I think they were claiming non-infringement, at least the opinion states that. But we are not trying to bring a declaratory judgment action, Judge Newman. I think that would present different and harder questions, because under the Supreme Court's precedent, we don't have to meet, and this court has noticed, we don't have to meet the rightness and immediacy concerns of a D.J. action. In a D.J. action, you can decide as a court, we're going to decide this later. This is now or never for Momenta. The agency, we brought a petition to the agency to cancel these claims. That's a distinction from a D.J. action. Agency action. And I should note, the agency granted this patent in 2013. Momenta started spending money developing this biosimilar before that. And then Momenta took advantage here of the IPR process, which Congress created precisely for this situation, to go to the patent office and say, you've made a mistake. You've granted a patent that shouldn't have been granted, and then we're telling this court,  At the same time, yes, Congress created these new administrative proceedings, but didn't in hand also turn over the keys to the federal court system. And so, therefore, that's why Consumer Watchdog wasn't able to come here. Neither was Phygenics. I'm not saying that Momenta is like those two. Obviously, Momenta here is an aspiring competitor. It's not a competitor yet, and it's years away from being a true competitor. And as we observed in Sandow's opinion, there's a lot of speculation to have to be made through a chain of contingencies to know whether or not you and your product that you say you've selected and think would infringe actually is going to make it all the way through to even filing an FDA application, let alone having it approved for you to enter the market. So I think that's the concern that we have. If it is true that you have to have a concrete harm, you know, despite the fact that immediacy and redressability concerns are somewhat relaxed, you still have to have a concrete harm. That's the concern that we have, or at least I have right now. And under established agency administrative review case law, Judge Chen, we have immediate harm. We have that harm regardless of whether we ever file an application. Mr. Wheeler attests that Appendix 3524, Paragraph 32, Momenta is at a fork in the road in the development program as a result of the patent office's wrongful action. And that's the action that causes Momenta harm. We've spent millions of dollars developing a biosimilar that practices this patent, and if this patent is allowed to stand now, Momenta is going to have to decide to abandon sunk costs, spend millions more changing direction, or to forge ahead in the face of certain— But expenditure of money, even large amounts of money, for the possible, you know, to deal with a possible harm down the road, I mean, that's what the Supreme Court held in Clapper is not necessarily a loan good enough. This is not Clapper, because what was hypothetical in Clapper was whether or not the agency there was ever going to act against the people who were petitioning the court. Well, the agency regulation didn't apply directly to the people before the court, whereas here the agency regulation, that is the imposition of infringement liability, applies directly to Monsanto, to Momenta. Exactly, Judge Dyke, but even more than that, not just the final infringement. This ruling applies to us in two ways. We want to practice this subject matter. We're currently practicing the subject matter. We have concrete development plans. This is what distinguishes us from Clapper. We're much like the farmers in Monsanto, Judge Chen, the alfalfa growers who wanted to plant and wanted to keep their seed untainted and had to spend monies because of the fear of taint. And we've proven the facts that are harming us here. The board has acted, and because of its decision, we're at a fork in the road. We're going to have to spend more money, and that's true. This court has held that having to spend more money, even in the face of maybe not enforcement, so that was this court's holding in Bayou. This court held that a pre-enforcement challenge to a D.C. statute to the pharma industry, that Bayou could challenge that. The companies there were spending money to avoid potentially having this law enforced against them under a reasonable fear, unlike in Clapper. What if, hypothetically, there was some scientific study that conclusively and definitively found, and everybody agreed, that any would-be biosimilar applicant, after they spend $20 million trying to develop something that's a biosimilar, there's only a 1% chance that that formulation will actually ever enter the market. Because of all the vagaries of difficulties and uncertainty of the science, and then also getting through the FDA approval process, there's a study that says you only have a 1% chance of making it. Would that be enough? If you had facts like we do here, where we've asserted, because of this wrongful— I'm just saying, this is my hypothetical. Yes, it could be. I'm answering your—I'm sorry, may I? I just want to take a running leap to you. Okay, take your running. If you had facts like we have here, which is that we've spent all this money developing this biosimilar, and because of the board's action, which is what harms us now, we are forced to change paths, that is harm, even if there's a 1% chance we might ever get— because the harm is today. Clinton, the line-item veto case from the Supreme Court, there the court expressly rejected the government's argument that they couldn't show they were ever going to get a deal. So that case involved a farmers cooperative who was complaining about President Clinton's line-item veto of a tax credit that would benefit the kind of sales they were making. And the tax credit didn't go to them. The tax credit went to the would-be purchasers. But the Supreme Court held that because that took away— currently took away a negotiating bargaining chip for the cooperative, they had injury in fact now, even though they could not show they would ever make a sale. And they rejected the government's argument that they couldn't show that as relevant. So the harm to Memento is from the agency action. This is not a DJ action. It's not an action really between us and Bristol-Myers Squibb. This is a petition to the patent office to cancel an invalid patent. They refused to cancel that patent. We've come here on APA review. Well, no one's saying, at least at this stage in this case, that you could not bring the IPR action, right? The only question is whether it's appealable to us. That's right. Okay. But the perversity of it is that we would be able to bring the IPR action but not appeal it despite its current concrete harm to us, placing us in this fork in the road where we'll have to make a decision one way or the other. And add to that, we're going to be a stop in the future by this order. That order triggers us another way. This is another way we're directly regulated. Your theory is that even if it's not appealable, if we feel bound to apply cases like consumer watchdog and so on, that the estoppel would take effect? If we aren't? If there's no injury in fact and there's no standing to appeal, then would the estoppel really for certain apply in such a situation because you never had a right to appeal that? I guess we don't know. I don't want to put you on the spot to hypothesize something that really is not an issue in this case. But the way around that problem is to recognize that MOMENTA is being currently harmed today by the agency action that's- No, the way around is not to accept Article III standing if you don't have it. That's clear. This is what we have to decide. Let's hear from the other side and we'll save you rebuttal time. May I make one quick point about the vacature? Do you want a final word? About the vacature. Okay. We would request that if the court does decide that MOMENTA lacks and that you vacate the board's decision to take away any question that we would have. Okay. Thank you. Mr. Sykes. Good afternoon, Your Honors. It's Christopher Sykes. Could you start with that last point that Mr. Maynard just said? I'd be happy to, Your Honor, and I'll take up two parts about it. The first is whether vacature is appropriate here and the guiding principle is actually out of the Supreme Court's U.S. Bancorp case. Vacature is an extraordinary remedy. It requires MOMENTA to show not even merely- That's dealing with a settlement situation. But it's dealing with when it's appropriate to vacate a decision below. We think, in fact, the standard is tougher here because we're talking about an Article III court that lacks standing. Do we have any cases where there's an agency proceeding which was ongoing but the person complaining about it was found to lack standing on appeal and the vacature question came up? Has this ever come up before? I'm not aware of a case- Well, I'm not aware of a case in these circumstances. I will acknowledge, Your Honor, that this court in PPG v. Valspar where it was the prevailing party which rendered the case moot that the court there was willing to vacate the order, but that's following the Bancorp approach, and the Bancorp approach is that vacature is extraordinary and occurs only where it is the prevailing party that deprives the reviewing court of power. So the party in Valspar, if I recall, the party that received the adverse board decision wanted to undo that board decision on appeal. They had the right to appeal that, and then that was taken away from them by the other side who issued a broad covenant not to sue. Correct, Your Honor. And that's exactly Bancorp. Under Bancorp, if it's the prevailing party that deprives the party of its right to appeal, then vacature is appropriate. They haven't done anything to deprive the right to appeal. The question is whether they had standing in the first place. It's not as though they've taken some voluntary act which has mooted the case. Your Honor, what I would say they've done here is they have taken the deliberate strategic action of coming in early, and I would note when they filed their petition in 2015, they hadn't started phase one trials. They knew, because there's statutory timing, that this IPR would be resolved. Okay, so let's talk about the appealability. It strikes me that your position is just inconsistent with, like, decades of the Supreme Court law about what injury is sufficient to allow somebody to challenge agency action, and that this is very unlike Figenic's consumer watchdog where there wasn't really any economic consequences to it. I mean, what Supreme Court case, in your view, supports the notion that with this kind of injury that there's no right to seek judicial review? Your Honor, I believe Clapper is on all fours with this case. Clapper is on all fours? That's ridiculous. Clapper is a situation in which the party in question wasn't even regulated by the federal government. Here, there is government regulation in the form of creating infringement liability against Momenta. This is not a sort of a third party who's standing aside from the federal regulation. Your Honor, I would point out that Momenta here is a third party to the PTO's action. The question is whether or not the PTO should revoke our patent rights as the patent. No, no, no, but they suffer legal consequences if the patent is upheld. There's a regulation directed to them, you cannot infringe this patent because it's valid, right? No, Your Honor, they would suffer injury if, down the road, they get approval and we sue them for infringement. They don't suffer harm from the PTO's action. I'm not talking about harm. I'm saying there's a legal restriction on them imposed by the patent office granting and sustaining the validity of this patent that they cannot infringe, right? Well, Your Honor, it's not quite that, but there's an estoppel that arises as there was in Consumer Watch Law. If there's a valid patent out there, they're regulated, right? They can't infringe. They cannot infringe. That is correct. They would infringe if we assert infringement down the road, if they're ever able to obtain approval. So the agency action in question imposes a legal obligation on them and that's not the case in Clapper, right? I don't believe that's the right analysis, Your Honor, because what they are complaining about here is the PTO's refusal to cancel our patent. What Lujan said, when a plaintiff's asserted injury arises from the government's allegedly unlawful regulation or lack of regulation of someone else, our patent, and this court in both Consumer Watch Law and FITENIX cited that language from Lujan as the proper standing test for purposes of appealing an IPR by a petitioner, and that is correct. Their harm, and we think this is important, their harm is whether or not down the road they will ever face infringement liability. What case, other than Clapper, in your views, what Supreme Court case supports the notion that there's no standing to challenge agency action under these circumstances? Lujan, we believe, is also relevant, Your Honor, and we think both of those cases make it clear. I mean, Clapper is absolutely clear that it says when you're complaining about costs that what they have to show is that they incurred certain costs as reasonable reaction to a risk of harm because unless the harm it seeks to avoid is not certainly impending, the harm that they seek to avoid is being found to infringe down the road. That is a case, is it not, in which the parties seeking standing were not regulated by the federal government, right? Well, that's true, isn't it? Because it was surveillance of the public. That is true, correct? They weren't regulated? Not exactly, Your Honor. That's not true? Well, the Supreme Court seemed to think it was true. Actually, Your Honor, the government, they were citizens, and the allegation there was that the government was unlawfully surveilling citizens. So they were potentially subject, but there was no evidence that they were actually subject. And it was too uncertain. The government action that they complained about was not directed to them. It was directed against people that they communicated with, right? Correct. So it wasn't a situation in which they were being regulated. Well, in that sense, Your Honor, the PTO is not regulating Momentum. It is granting or revoking our patent, just like the court recognized in Consumer Watchdog and Financial Assistance Court recognized these are third-party standing cases, and that's critical to the standing. Well, the difference, the critical difference in these PTO proceedings is the estoppel aspect. Is your view that, assuming, like Consumer Watchdog and its concerns raised here, that there can be, at this stage, no appeal to this court, that the estoppel nonetheless takes effect? Yes, Your Honor, and we think that's important to the Congress's provision. Do you take that from the statute? The statute doesn't say. The statute, we believe, does say, Your Honor. The statute says that this is appealable to the federal circuit. Is there not an implication that the estoppel takes effect based on the decision on appeal? I don't believe so, Your Honor, because the provision that governs estoppel here is 35 U.S.C. section 315E2 that estops a petitioner in an IPR that results in a final written decision under section 318A. So the estoppel is tied to the final written decision from the board. There is a separate provision concerning appeal, which is 319. That is not made a condition of estoppel. Then why isn't this an additional powerful argument on their side in terms of immediacy and reality, which otherwise we're having trouble with? So, one, we do believe estoppel applies here so that you can't file repetitive, for example, IPRs or just take a free shot at IPR. The estoppel is important to cabinets to one shot. It would apply in a district court infringement litigation. That is section 315E2, Your Honor. It would. And the reason is because the harm, everything they're talking about, all of their alleged harm ties to a fear of infringement. And they cannot infringe now. They are protected now. There is no infringement now unless and until they can obtain approval for a product within the claims. And one thing I would note, Your Honor, just to be clear on the record, although Ms. Maynard says that their product infringes the 239 patent, that's not in the record. This is new information we've just been given. If you look, for example, in Mr. Wheeler's declaration that was submitted in support of their position, which is in appendix 3513, for example, paragraph 29, though it's throughout on page 3523, says if BMS is right and the 239 patent covers Orencia, Momenta expects BMS to sue Momenta or its partner for infringing when Momenta receives FDA approval. They don't acknowledge. In fact, we have no information about their product. There's nothing in the record that says it infringes. The record shows that their product is the same as yours. Your Honor, I think what they are saying is that they're developing a product that is to be similar. As a formatter, although we don't know anything about the product, it's certainly not the same. And, in fact, I think the failure of phase one shows that it's the same. But the same for purposes of whether it comes within the claims of the patent. We just don't know. There is nothing in the record that says whether or not their product is within the patent or not. Nothing in the record except Ms. Maynard's statement today in court that it infringes. But, more importantly, we're at phase one here. We are exactly the situation that this Court acknowledged in Sandoz. In Sandoz, this Court stated on page 1279 of 773F3rd, we are aware of no decision in which we have found a case or controversy when the only activity that would create exposure to potential infringement liability was a future activity requiring an FDA approval that had not yet been sought. That is this case. In fact... What about Ms. Maynard's argument or reading of Sandoz pointing out that there's a section in the Sandoz opinion that perhaps was carefully written, I can't be sure, I need to go back and look, that points out that Sandoz did not actually allege any kind of harm in the way that Momenta is currently now alleging. Your Honor, I believe that is a misreading of the Sandoz case, and I would point out that in finding it not justiciable, this Court at page 1281 citing to Texas v. U.S. said, in the pre-application context presented here, we conclude that the events exposing Sandoz to infringement liability, quote, may not occur as anticipated or indeed may not occur at all. That's exactly here. And there's a bigger problem that's worth noting here, which is if Ms. Maynard were right that, for example, the earlier Momenta somehow has standing and the later Sandoz does not, and certainly it's very clear that anyone that's in Phase III trials for a biologic product has invested substantial resources, then every case, every case where the patent owner prevails is going to present this exact same fight, and in every case this Court's going to have to resolve is this particular petitioner over the line or under the line and where is the line. This Court recognized in Sandoz there's a bright line here, as there should be for jurisdiction, and that is the filing of the marketing application. Keep in mind, Sandoz is not a case involving review of agency action, and our cases have said that the Article III requirements are less stringent in that context. Your Honor, there is a hard floor for all cases, which is this concrete injury, which Clapper described as showing— Well, that's what your problem is, because the Supreme Court cases seem to say that this kind of injury is sufficient to challenge agency action. Your Honor, with all due respect, we read the cases, and we think Clapper here is very clear. What's being alleged is a threat of future injury, and that's the case here. It's the threat of infringement liability that they say has forced them to take costs now. You're suggesting that the Supreme Court standing cases say that you can't have standing based on future injury? They can, so long as the risk is certainly impending. In fact— Well, they say the risk here is certainly impending. In paragraph 23 of their affidavit, they say—this is on 3521 of the record— they say Momenta considered multiple options for developing a biosimilar. One was to make a biosimilar version similar to branded RENCIA as possible. We chose that option in part based on our continued belief that the 239 patent is invalid, allowing Momenta to launch its product without a serious threat of patent infringement. Your Honor, the harm is if they get sued in the future. As that paragraph goes on to say, their worry is down the road, if they get approval, they may get sued. But think about— You mean they have to show that they're going to be sued for infringement right now? I mean the Supreme Court has, even in the declaratory judgment context, said that that's not the test for declaratory. It doesn't have to be a risk of imminent suit. They specifically overruled our line of cases on that. Your Honor, it's not a time issue. It's a certainly impending issue. And think about the uncertainties, which this Court recognized in Sandoz. They have to succeed in Phase 1 and succeed and move forward with one that's within the ambit of the patent. Then they have to move into Phase 3 with that product, not this alternative they admit they have. That has succeeded. Then they have to file their biosimilar application. And notice not only are those highly uncertain, as we've seen. Phase 1 failed here. But much of that is within Momenta's own control. They acknowledge they have different pathways. It's their choice. As the Court said in Lujan, this is at 504 U.S. 564, Note 2, that this requirement that the asserted injury be certainly impending has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. This is all choice of Momenta. Will they proceed with one within the ambit of 239 or a different one? We don't know. Will they finally succeed in Phase 1? We don't know. Will they then choose to move to Phase 3? That's up to them. Which formulation will they move into Phase 3? That's up to them. Will that succeed? Highly speculative. Will they then choose to file a biosimilar application? That's up to them. This is exactly what the Court in Clapper and Lujan said is not concrete injury sufficient to give our understanding. Well, interesting, Your Honor. The Court in Clapper discussed Monsanto at length. In Monsanto, as the Court in Clapper noted, there, all of the – and I'm just reading from Clapper – at 133 Supreme Court, 1153 to 54. There, in that case, it hinged on evidence that the genetically engineered alfalfa seeds were currently being planted in all the major alfalfa seed production, that bees pollinate alfalfa have a range of at least 2 to 10 miles, and that the alfalfa seed farms were concentrated in the area well within the bees' pollination range. The risk of harm was, at that moment, existing, real, and impending. And the Court expressly, in Clapper, noted that about Monsanto. There was no control by the plaintiff alfalfa growers there, choosing whether or not their fields would be contaminated by bees coming from the other fields. That was happening then and there. They're saying here that the risk of harm is real and immediate because they are spending millions of dollars to develop a product which may be off the market because it's infringing. It's not as though they're saying we're going to spend some money in the future. They're spending the money now, right? Your Honor, they have no product now. They are spending – They are spending money now, right? As – Maybe the pivot point here is just the nature of the science in trying to develop these highly complex biologic products. I mean this isn't like Moment is in the business of manufacturing and selling bikes, and it needs to know whether it can make a 10-speed bike or a cruiser bike. These biologics seem to be very complicated and very hard to make for whatever reason, and it's uncertain whether they'll actually be able to successfully navigate the very difficult, uncertain path to arriving at a product that actually is ready for filing at the FDA. Your Honor, you're absolutely right to think technology really matters, and of course it was reviewed as well in sentence. It's highly uncertain, but the problem is Article III standing is one that turns on concrete injury. Speculative injury, uncertainty about the future, cuts against Momentus standing. They're seeking advice as to how they should proceed with a product that may never get to the finish line anyway. So it's particularly advantageous for your client that these people have no way, in your view, to challenge the validity of a patent without running the risk of spending millions of dollars that they could lose. They have no way of getting a determination as to whether what they're doing is permissible under the patent or not. Your Honor, actually, there's two answers. The first one is they remain free, as they did, to go to the IPO early, but more importantly, Congress considered all of this and came up with what it viewed as an early adjudication system for these patents, and that was the filing of the biosimilar application well in advance of its possible approval. But that's only after the filing of the application. After the filing of the application, but they were pushing justiciability back in doing that, like Hatch-Waxman. Under the law before Hatch-Waxman, under the law that applies to, for example, device products. Are you suggesting that in the Biosimilars Act they were restricting standing? To the contrary, Your Honor. I would say they were pushing it possibly to its limits, going from marketing a product that infringed, which is the law, for example, with device products. Okay, but come back to the point. There is no way that somebody who wants to compete with your client and thinks that the patent is invalid can enter the market without putting at risk millions of dollars. There's no way, in your view, of securing a determination of patent invalidity. Oh, it is your way. I didn't mean to interrupt. Go ahead. You finished the sentence? Yeah. You mentioned Hatch-Waxman, and it seems to me that this fits right into the subject that we're exploring because Hatch-Waxman does permit suits for artificial acts after the ANDA is filed. That's correct. But it can't be more than a year before marketing is planned for. Isn't that correct? So what would your position be if, in fact, on these same facts, well, they would have had to have succeeded on the Phase III trials, I suppose, before the ANDA could have been filed, but there still would not have been commercial marketing. They would have been in the Hatch-Waxman phase. Would that, in your view, change the Article III situation? Of course, Your Honor, because the key time at which Article III standing must arise is not the filing of the IPR petition, but the filing of the notice of appeal. That's when this Court judges its Article III standing. And, of course, all these time frames are spelled out. They know how long the trial is. They know the results, how long it takes them to put the application together. And, of course, they know how long an IPR takes. That's statutory. They could have filed. They could have waited. They decided to jump in early. But they could have waited and filed during their Phase III trial or before their Phase III trial, knowing the timeline, knowing that at that point they have Article III. Of course, nothing prevents them from doing it. So would Phase III be enough, in your view, for them to permit them to review an adverse agency action? No, Your Honor, because by filing the IPR petition at that point, by the time they get their written decision and potentially need to appeal, they'll have their biosimilar application on file. Right, but so that's what we're trying to figure out here is, is there a gap? Is there a delta between what the Biosimilar Act provides, which is, you know, once someone files an FDA application, they're now considered to be infringing, right? And at some point before that, can someone have the right to appeal an adverse patent board decision here, given that the requirements for a justiciable case or controversy are at least somewhat relaxed? I don't believe so, because I think it's the artificial act of infringement that creates the potential risk of harm. That's the necessary injury, in fact. And that's a nice, clear line as well. Keep in mind, that line is pushed back. Traditionally, litigation is created upon marketing. It's Congress that created an artificial act of infringement. That's a great situation for your client, because you can have an invalid patent and nobody can even get to the point of challenging it without filing an application. And that requires millions and millions of dollars that they have to put at risk, even before they can get a determination of whether they're barred by the patent. Well, Your Honor, they were free to file their APR. The key, what created this situation is that the patent, far from being invalid, was found by the board to be valid. Well, that's the question. I mean, how can it be that somebody can't, before investing enormous amounts of money, secure some sort of determination as to whether it's all for naught or not, because the patent covers them? Well, Your Honor, of course, they can get a determination from the board, which they got. What you're asking is, why isn't there Article III standing earlier? But Congress weighed all of this and created the artificial act of infringement, which is the touchstone for Article III standing. They can go to the board, and there's going to be an estoppel if they go to the board and lose, and they have no right to get judicial review of an adverse board decision. It's a pretty good situation for your client, isn't it? Well, Your Honor, it's only a good situation here because, as it happened, we prevailed at the board because we have a strong patent. But the fact is, the IPR remains there. It serves its function. What they are asking is one of two things. Either give them standing so they can get into an Article III court well before what would ordinarily be available, which we think is forbidden by Article III, or somehow give them a mulligan and a second bite at the apple by vacating so they can do early IPRs and suffer no consequences. You know, the only one at risk then is us, who had our patent challenged, which doesn't make sense either.  No, it was challenged, and we prevailed. It doesn't make sense to give them multiple bites at the apple to challenge our patent. But I thought that Congress contemplated there'd be judicial review of IPRs. I think, based on Consumer Watchdog and Phygenics, they created an avenue for appeal, but it requires Article III standing, and there's all sorts of cases in which people can be heard before an agency but not have Article III standing. Phygenics is one, Consumer Watchdog is another, and we believe this is a third, Your Honor, because they jumped in early. They jumped in early. They didn't wait to a point where they were going to have a biosimilar application on file and injury in fact. You know, this court in Sandoz went through all of the contingencies between, you know, being in development and actually facing a real threat of infringement liability. That's the touchstone under Clapper and Lujan for them to have Article III standing, which is necessary to this court. Now, Your Honor, I know I'm wrong. I can touch briefly on the merits if this court is interested in discussing the merits. That wasn't a point. Okay, very briefly. Very briefly. Actually, that wasn't raised by Ms. Maynard, so I think perhaps it's inappropriate on rebuttal. Fair enough, Your Honor. Any more questions? Any more questions? Thank you. Okay. Ms. Maynard, you have a few minutes. Judge Newman, I did start my argument with obviousness, and, of course, we want the court to reach the obviousness question. So if, you know, if the court wants to hear about those issues, that's, of course, our preference would be to get to those issues because this is an exceptionally weak patent. On standing, we are, I agree with all of the sentiments of Judge Dyke's questions, which is it would be inconsistent with Supreme Court precedent, D.C. Circuit precedent, and years and years of agency administrative review law to hold that under these circumstances, Memento is not presently harmed by the adverse board decision here. The board refused to cancel a patent, and that's going to cause us harm in at least two ways. Now, I think you need to tell us why the general thrust of Article III standing and the particular exception that's already been crafted into the Hatch-Waxman Act don't apply, particularly Hatch-Waxman. It's not before us, but I do think you would have quite a different situation if you were in the Hatch-Waxman phase. With respect, Your Honor, it would be the biosimilars statute here, but there is an artificial act of infringement. The same one applies there. And that's a different, that's a question about getting into court. And the artificial act of infringement ripens. It takes care of the imminence and ripeness question. Yes, Article III is standing in the court. Here we are in the court. Whether, in fact, Congress should have considered a little more carefully when they provided for an appeal and an estoppel and these uncertainties that are now before us. The two schemes, the two schemes are different. The biosimilar statute allows artificial infringement, which advances the rightness and imminence for a district court action. You don't have to consider rightness and imminence in this context because we're talking about an agency appeal. The Congress also created a different avenue if parties in the legislative history suggest biosimilar applicants were parties that were in the district. No one's challenging the right to go to the agency. But the harm, Your Honor, is exactly the harm Congress envisioned, which is having to be placed in the choice of spending millions of dollars, you know, copying, you know, practicing an invalid patent or having to spend millions of dollars designing a patent. But every generic or would-be copier. And therefore, we have the Hatch-Waxman Act, which balances all of the interests on all sides and says, yes, you can. We will create an artificial act of infringement that will get us around Article III. And you can challenge the patent under Hatch-Waxman, even though you are not infringing. That is one avenue. So why doesn't that apply here? Because the harm here is caused by the adverse agency. That applies under Hatch-Waxman as well. For a generic to get through Article III or Phase III trials without an opportunity to challenge the patent certainly involves the millions of dollars that you've been telling us about. So the safe harbor scheme of Hatch-Waxman, Your Honor, is for valid patents. And the idea is to let people— Well, you're in a safe harbor phase now. That's why you're not being sued and can't be sued. But we're being forced to spend dollars as a result of this erroneous agency action. And that itself is a concrete harm facing Momenta now, regardless of whether we ever make it to Phase III, regardless of whether we ever file an application. So you're saying Hatch-Waxman is wrong? It's just different, Judge Newman. It applies in a different situation. You're saying it's not exclusive, that the mechanisms that are provided in Hatch-Waxman are not the exclusive method for challenging patents. And Congress in the AIA provided another method for challenging patents, which presents a different set of circumstances. That's right, Your Honor. And neither answers the Article III question before this court, which is, does this adverse agency action harm Momenta today? And it does. And, Judge Newman, the estoppel provision harms us now. And the United States filed a brief in Consumer Watchdog where it said, unlike that case where that party was not practicing the subject matter, as we are, where that party didn't have concrete plans, as we do, to practice the subject matter, and where that party would never face an infringement suit and therefore never face the estoppel, the estoppel provision didn't matter. But the government suggested that the estoppel provision for someone who was in our shoes would advance the harm and make it now or never for Article III review. And so the United States government suggested in its brief in Consumer Watchdog to this court that the estoppel provision would advance the harm and make it now. If we are estopped now by this ruling, and even if we have to, that is harm now. That's kicking in now. And now is our chance to get court review about whether or not we're going to be estopped. We've never decided whether the estoppel would take effect under circumstances such as non-appealability, I believe. Do you know of such a case? I don't, Your Honor. And again, as I said before, if you're going to hold that momenta can't appeal, then we would request that you vacate. And you have the authority to do that in your equitable discretion, as this court has recognized, and so does the Supreme Court. But more importantly, even if, and Judge Chin, even if you think that we need to establish that we are at a threat, we have a certainly impending threat of being sued in the Clapper way. And Clapper is a very different case. And Clapper is about imagined government action that might hurt them. And that's not what we have. We have a government that refused to cancel a patent that we think is invalid, that is blocking our freedom to operate. And we think it's taken from momenta, who is part of the public domain, subject matter that ought to be in the public domain, and it's hurting us right now. And we have concrete declaration to this court saying we're harmed right now. And that's enough. But even if you thought – But what if it's really the failure of the phase one that's really blocking your choices to operate? The failure in phase one has nothing to do with whether or not – we're at the same fork in the road as we were when we appealed. And the PK study has nothing to do with the claims of this patent. It's got no therapeutic value whatsoever. Has momenta announced what it's going to do? I mean, what are its choices right now? Phase one didn't work. So where does that leave them? They can't move on to phase three now. We know that. Momenta is analyzing results, but momenta is committed to the program. So it's a bump in the road, but the fork in the road – But in what form? We're still at the fork. What form is the program going to manifest itself next? I guess that's really the question. But the PK study, which has to do with the effect of the drug in the body, this patent is about a stable liquid formulation that goes into a syringe. It doesn't have anything to do with the PK. And the momenta is proceeding with the program and is – in some ways, we need to know the answer now more than before because if we do adjust the program at all, we have to know whether we can practice this patent or not. The failure of phase one makes you more of a concrete harm than the success of the phase one? That would not make sense to me. Because with respect, Your Honor, you're looking at the wrong thing that harms us. The thing that harms us is the agency's refusal to cancel this patent, which is a roadblock in the program as planned. And so that is a current harm under D.C. Circuit precedent, under this court's precedent, under the Supreme Court's precedent. Having to alter business plans as a result of government action gives you standing to appeal. So I'm just trying to understand the logical extension of your position. If momenta had – five years ago, they hadn't spent any money yet, but they were very interested in the potential of pursuing a biosimilar for the Orencia and it filed an IPR and then it lost the IPR, would you say that you would still have standing? Because you're on the cusp of spending a lot of money and then ultimately pursuing a phase one and then a phase three and then an FDA application. Would that be enough, in your view, for standing? Because in the end, what's happening here is choices that need to be made for a business to organize its affairs, to spend a lot of money either this way or that way. And so without having spent any money yet, that's still enough of a concrete harm. That would be a much tougher case and that might put you more in a Lujan situation. Someday intentions are not enough, but Lujan also says – Well, what if we had a declaration from Mr. whoever, Wheeler, that said we will spend money, but we need to know which way to spend the money. We haven't spent any money yet. If we can successfully invalidate this patent, then we will spend it pursuing that patented invention. That would be a harder case. Why? It would be a harder case because what we have here is monies that – very concrete plans that are not only concrete, but they're in place. Money has been spent. The declaration is that sunk costs will be lost as a result of this action if we can't challenge it, and plans will have to be changed and millions more will have to be spent that wouldn't have to be spent. We are – we have easily cleared the hurdle of injury in fact under all precedent of which I'm aware. Your case, it would be a harder case, but the court in Lujan suggests and the dissents in that case and the concurrences suggest if those parties had bought plane tickets – plane tickets to visit the areas where the endangered species were, the case might come out differently. We have helped millions of dollars of plane tickets proceeding along this path, and it's not our choice that the patent office granted this invalid patent in 2013 after we had already invested lots of money in this program, and then we took the remedy that Congress gave us, which was to go to the patent office and say, you've made a mistake, and the patent office has now made another mistake by saying, no, this patent actually is some kind of invention, even though it's a combination of nothing but everything people of skill and the art know, and now we are harmed by that decision, and we should be able to challenge it in this court. I think we have the argument. Anything else that you need to raise? Thank you. I appreciate your indulgence. Thank you both. The case is taken under submission. And that concludes this morning and afternoon's arguments for this panel.